Curtis **CHEEVES**, et al., **Plaintiffs,**

v.

**SOUTHERN CLAYS, INC.,**
**et al., Defendants.**

**UNITED STATES of America,**

v.

**Robert L. WATKINS.**

**Nos. 86–43–1–MAC(WDO),**
**86–44–2–MAC(WDO).**
**Crim. No. 89–46–MAC(WDO).**

United States District Court,
M.D. Georgia,
Macon Division.

June 17, 1992.

Richard A. Schneider, Atlanta, Ga., for Southern Clays, Inc.

Paul C. McCommon, III, Macon, Ga., for U.S.

Franklin R. Nix, Atlanta, Ga., for Watkins.

## OPINION AND ORDER

HODGES, District Judge.

On December 20, 1991, counsel for the Plaintiffs in these consolidated civil cases, acting also as counsel for the Defendant in the criminal action, filed separate notices of the taking of the oral depositions of the three District Judges of the Middle District of Georgia including Chief Judge Wilbur D. Owens, Jr., who was then, and is now, the presiding judge in each of these cases. Subpoenas *duces tecum* were also issued and served at the same time upon each of the judges. The notices stated that the depositions would be taken "with respect to factual matters relevant to [the presiding judge's] disqualification." Motions to quash the notices and subpoenas were promptly filed by the Defendants in the civil action and by the United States in the criminal action.

Because the judges of this Court would obviously be disqualified from ruling upon the legal efficacy of notices of depositions and subpoenas directed to themselves, the Chief Judge of the Circuit, acting pursuant to 28 U.S.C. 292(b), entered an order on December 27, 1991, designating me to sit in this District for the purpose of deciding the motions to quash "and any matter relating to any party's attempt to take the depositions of [the active judges]." Due to the

imminence of the scheduled depositions,[1] I entered an order on December 30, 1991, suspending the notices and subpoenas so that the issues presented by the motions to quash could be briefed and a hearing conducted. I later conducted that hearing; and, after full consideration of the arguments of counsel, both oral and written, as well as the underlying record, the matter is ready for decision.

Broadly stated, the issue to be determined is whether, and under what circumstances, if any, a judicial officer may be compelled to personally submit to discovery inquiries in aid of a motion to disqualify one of such officers from proceeding further in a case over which he or she is presiding. If there are circumstances in which such discovery may be compelled through use of the subpoena power, as is being attempted here, the case-specific and narrower question presented is whether such compulsory discovery may be pursued in the present litigation.

I have determined that the attempted discovery may not be pursued, that the motions to quash should be granted, and that the depositions of the judges should not be taken.

## A. BACKGROUND

The extensive litigation and underlying factual matrix giving rise to the present issues is both lengthy and complex. Because the questions to be decided are primarily issues of law, however, I will describe the factual setting as briefly as possible.

In the early 1980's, Robert L. Watkins entered into a number of agreements with persons who at one time had, or whose ancestors had, a claim of title to land in middle Georgia containing substantial deposits of kaolin, a rare and valuable white clay used in the manufacture of ceramics and high quality paper, and for medicinal purposes. The agreements appointed Watkins as the attorney-in-fact for these various persons to pursue whatever claims they might have against the present record owners of the subject lands. As compensation, Watkins was to receive contingent fees ranging from 7% to 15%.

In early 1984, acting pursuant to some of those agreements, Watkins filed for record in Washington County, Georgia, affidavits and other papers specifically describing certain land then owned, according to the record title, by Loulie Eugenia Tarbutton as Trustee. The papers filed by Watkins set out claims of fraud and asserted, in effect, that the title to the property remained vested in the heirs of one Jeff Carter. As might be expected, a civil action to quiet title was then filed by Loulie Eugenia Tarbutton in April 1984, in the Superior Court of Washington County, Georgia, styled *Tarbutton v. All That Tract or Parcel of Land etc., et al.* The case was removed to this Court on the basis of diversity of citizenship and was ultimately decided by Judge Duross Fitzpatrick who entered an extensive opinion on August 6, 1986, granting summary judgment to the Plaintiff Tarbutton. *See* 641 F.Supp. 521 (M.D.Ga.1986).[2]

One of the issues litigated in the *Tarbutton* case involved the authenticity of a deed dated January 31, 1938 from Esther Scott, one of the Carter heirs, to B.J. Tarbutton. A deposition was taken of one Charles E. Williams who testified (falsely) that he had signed the deed as a notary witness; that it was blank when he did so; and that only he and B.J. Tarbutton were present at the time.

In February, 1986, while the *Tarbutton* case was still pending, the instant civil cases were filed and were later consolidated. In these cases, which also involve lands containing valuable deposits of kaolin, the plaintiffs seek to recover damages resulting from the defendants' alleged

---

1. The original notices specified that the depositions would be taken commencing on January 2, 1992, and subsequent notices and subpoenas rescheduled them for commencement on January 9, 1992.

2. Judge Fitzpatrick's award of summary judgment rested upon application of the doctrines of adverse possession and the statute of limitations. The case was settled by the parties after entry of the judgment and no appeal was taken.

fraudulent purchase of the property from the plaintiffs' predecessors in title in 1954 and 1962. The cases were assigned at the time of filing to Chief Judge Wilbur D. Owens, Jr. and, except for my limited and special designation, are still pending before him. All but one of the plaintiffs in these cases have an attorney-in-fact, contingent fee agreement with Watkins, but unlike the *Tarbutton* case, he is not a named party.

During his consideration of the *Tarbutton* case, Judge Fitzpatrick formed the opinion that Williams had committed perjury in his deposition (*see* 641 F.Supp. at 528–529), and apparently believed also that Williams had been suborned by Watkins to do so. After entering summary judgment in August, 1986, Judge Fitzpatrick conferred with Chief Judge Owens in September or October of that year as to what action he, Judge Fitzpatrick, should take concerning his beliefs. It is this conference between Judges Owens and Fitzpatrick that constitutes the focal point of the subsequent motions in these cases seeking recusal of Chief Judge Owens and the attempted discovery by deposition of the details of the conversation that occurred during the meeting.[3] In any event, following his conference with Chief Judge Owens, Judge Fitzpatrick referred the matter to the U.S. Attorney for investigation and possible prosecution; and, in the meantime, he stayed and later recused himself from further participation in other litigation in which Watkins acted as attorney-in-fact for the plaintiffs.[4] Additionally, during the progress of the instant civil cases (after Watkins' indictment), a discovery dispute arose involving a non-party, and Chief Judge Owens was unable to hear the matter. The usual practice in such circumstances would have been to present the issue to the other judge in Macon, Judge Fitzpatrick; but, upon being informed of the dispute, Judge Fitzpatrick wrote a letter to counsel for the plaintiffs dated July 11, 1989 declaring that he, Judge Fitzpatrick, had "a bias or prejudice against Mr. Watkins as I would anyone who is indicted for counseling another to make a false statement under oath, particularly if that indictment arose out of a case in my court.... I have been advised that Judge Elliott [resident in the Columbus Division] will handle the case." A copy of this letter was sent to the attention of Chief Judge Owens as the presiding Judge in the cases, and this too is a focal point of the subsequent motions seeking Chief Judge Owens' recusal.

On April 27, 1989, acting on the earlier reference from Judge Fitzpatrick to the U.S. Attorney, the Grand Jury returned an indictment against Charles E. Williams and Robert L. Watkins.[5] It charged, in one count, a violation of 18 U.S.C. 1623 (making a false declaration under oath). It alleged, more specifically, that Williams had testified falsely concerning the Esther Scott deed in a deposition taken in the *Tarbutton* litigation, and that Watkins had "induced and procured" him to do so. The criminal case—which is the instant criminal proceeding—was also assigned to Chief Judge Owens who presided at Watkins' trial in January, 1990.[6] Watkins was found guilty by the jury and, on March 23, 1990, was sentenced by Chief Judge Owens to a commitment term of five years imprisonment and a fine of $50,000.00. On appeal, in an unpublished opinion, the Eleventh Circuit affirmed the conviction. See *United States v. Watkins*, 921 F.2d 285 (11th Cir.

---

3. It is clear from the existing acknowledgments in the record by Chief Judge Owens that this conference occurred. It is only the precise date and the precise content of the discussion that remain uncertain.

4. *McLendon v. Georgia Kaolin Company*, Case No. 85–338–2–MAC(DF). Judge Fitzpatrick's order of disqualification was entered on August 17, 1989, subsequent to Watkins' indictment.

5. In fact, the indictment resulted from a second presentation to the Grand Jury. An earlier no-true-bill had been returned when the Grand Jury first considered an indictment of Watkins alone.

6. An earlier trial as to Watkins in November 1989 resulted in a mistrial when the jury could not agree upon a verdict. The case of the Defendant Williams was previously transferred to the Eastern District of Michigan pursuant to Rule 20, F.R.Cr.P., for the entry of a plea of guilty.

1990), *reh'g denied*, 931 F.2d 901 (11th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 333, 116 L.Ed.2d 273 (1991).

Earlier, during the course of the pretrial proceedings in the criminal case, the first of what has now become seven successive motions was filed seeking the disqualification of Chief Judge Owens in these cases.

## B. THE MOTIONS FOR RECUSAL

1. On October 27, 1989, in advance of trial, the first motion for recusal was filed in the criminal case. It was made pursuant to 28 U.S.C. § 455(a) and asserted that Chief Judge Owens had made a comment during a recent hearing in the civil cases (*Cheeves and Gibson v. Southern Clays, Inc.*) that he was "familiar with the circumstances" which caused Watkins' indictment. It was also asserted that Chief Judge Owens had received a copy of Judge Fitzpatrick's letter to counsel in the civil cases dated July 11, 1989 in which Judge Fitzpatrick openly acknowledged his bias against Watkins. These events, the motion concluded, would "reasonably cause an objective observer to question Judge Owens' continuing impartiality in this matter." The motion was discussed during a pretrial conference held on November 1, 1989, and was then denied by a brief, written order entered by Chief Judge Owens later that day.

2. The next motion for disqualification was filed in the civil cases on November 13, 1989. It asserted two grounds.[7] The second ground reiterated the points earlier advanced in the criminal case—that Chief Judge Owens had expressed familiarity with the circumstances which caused Watkins' indictment and had received Judge Fitzpatrick's letter of July 11, 1989. It was also asserted that Chief Judge Owens had expressed the opinion during a hearing that Watkins was a real party in interest in the civil cases even though he did not appear as a named party. The motion was denied by order entered January 17, 1990. The Court found that there was no showing of extra-judicial bias which would cause an objective observer to entertain a significant doubt about the judge's impartiality.

3. The third motion for disqualification was submitted in the civil cases on January 25, 1990 in the form of a motion and brief seeking reconsideration of the previous motion and the order denying it. The motion asserted "new evidence," namely, a statement made by Judge Fitzpatrick during a hearing he had conducted in the *McLendon* case (*see supra* note 4) to the effect that he, Judge Fitzpatrick, had held "a conference with another judge" after the *Tarbutton* case concerning the circumstances surrounding Robert L. Watkins' involvement in that litigation. The motion asserted that if Chief Judge Owens was that "other judge," then additional circumstances existed which would cause an objective observer to conclude that bias existed. The motion for reconsideration was denied by a brief order entered January 30, 1990.

4. The next motion for recusal was filed in the criminal case on March 19, 1990, a few days before the scheduled sentencing hearing, Watkins having been convicted at his trial in January. It was predicated, for the first time, on 28 U.S.C. § 144 in addition to Section 455(a), and was accompanied by a lengthy affidavit signed by Watkins.[8] Again, the essence of the motion and affidavit concerned the conference between Judge Fitzpatrick and "another judge," believed to be Chief Judge Owens, and Chief Judge Owens' receipt of the copy of Judge Fitzpatrick's letter of July 11, 1989. Chief Judge Owens then conducted a hearing on the motion on March 20, 1990, during which the following colloquy occurred:

---

7. The first ground related to the association of one of Chief Judge Owens' former law clerks with the law firm representing one of the defendants. This issue was resolved and has not been reasserted in subsequent motions.

8. The motion was also accompanied by written interrogatories addressed to the three judges of the district, respectively, the answers to which would "perfect the record on Defendants' Motion for Recusal." The interrogatories were substantially identical to written interrogatories subsequently filed in the civil cases as well. None were answered.

MR. KIRWAN [Counsel for Watkins]: Your Honor, I think that the only new evidence would be the discovery of the conference where Judge Fitzpatrick indicated he had a conference with another Judge.

THE COURT: No, that's nothing new.

MR. KIRWAN: Well, that's my understanding of what was—had never been revealed before as to who was that other Judge.

THE COURT: No, it was revealed way back there that he told me at the time that he came to the conclusion that he was going to refer the matter to the Grand Jury, that he was going to do so, and that's what sent the case, the civil cases to me. It was—every cummunication [sic] though, has been between us as Judges. So—

MR. KIRWAN: That's my understanding, is that that was the new evidence; that was not heretofore been made known, so that was my understanding.

THE COURT: Well, let's assume that that was so-called new evidence; what would that demonstrate as far as bias or prejudice?

MR. KIRWAN: Well, I think that the affidavit, as I understand that a 144, if the affidavit is facially sufficient, then that would cause the Court to refer it to someone else.

THE COURT: Oh, I don't question that, but I question that within the decided cases, that that is an extrajudicial communication that would give me personal bias, anymore than the letters that Duross has sent saying that he was biased. How does that affect me?

MR. KIRWAN: Well, I think if the Court received copies of those letters, the—

THE COURT: I did. Nobody has ever denied that.

MR. KIRWAN: I understand.

THE COURT: He showed copies of letters to everybody.

MR. KIRWAN: I think that the showing of those letters to the Court is not in a "judicial function."

THE COURT: Well, what function is it? Do you think that's his personal function?

MR. KIRWAN: Well, the correspondence between, you know, the Court as to matters that are pending, I think that it raises the spector [sic] of impropriety as to if Judge Fitzpatrick has communicated to you his belief as to Mr. Watkins' dishonesty or whether or not he would believe them as far as he would throw a piano, or something along those lines, then that—

THE COURT: And he said he would not believe him.

MR. KIRWAN: Yes sir, and that would taint Your Honor just basically because of those statements along those lines. Just like the fruit of the poisonous tree, once the well is poisoned, then it's poisoned for everyone.

THE COURT: You think that one Judge would base his decision upon another Judge's feelings? You don't seriously suggest that.

MR. KIRWAN: No sir, but I think that, as I understand the standard is what an objective layperson would think, if they looked at this, and I think that's what the standard is, and we would ask the Court that it's not so much subjective anymore, but it's what that, you know, the unsophisticated layperson would think based on the transactions, and that's what our position is.

THE COURT: Well, Bruce, this is exactly the contention that was made before that I've already ruled upon twice; not once but twice.

\* \* \* \* \* \*

MR. KIRWAN: Well, my argument on that, Your Honor, is that if, in fact, that the portion of what we say is newly discovered evidence; that is, that there was a transcript of a conference where Judge Fitzpatrick says he had conferred with another Judge, and that other Judge is unknown or not mentioned in that transcript.

THE COURT: Somewhere I know this has been discussed, because as I say, there was never any question that he

talked to me and that I therefore knew that he was sending the matter to the Grand Jury.

MR. KIRWAN: Your Honor, that's not—my understanding of the facts is a little bit different. I don't know whether that fact has ever been known or not.

\* \* \* \* \* \*

THE COURT: But now, my present research indicates that everything that has happened in this case, and my present knowledge, has been as a result of my duties as a trial judge. There's nothing that I know of that indicates that I have any personal bent or bias against Robert Watkins. As I recited before, I didn't even know Robert Watkins until he came to the criminal case. He never even appeared with counsel in the middle of the civil cases and, of course, during the criminal case, as you will see from the transcript that Frances says she's going to file today, that it was never an issue in that case except factual to the jury. There wasn't even any dispute over the charge. So, it was just a straight, plain old perjury case submitted to twelve people who decided to convict him. I never had to decide anything, when you get right down to it.

Three days later, on March 23, 1990, Chief Judge Owens entered an order denying the motion on the basis that no personal or extrajudicial bias was shown; that any communications from Judge Fitzpatrick to Chief Judge Owens occurred in a judicial setting with both participants acting and speaking in a judicial, not a personal capacity; and that any personal bias on the part of Judge Fitzpatrick toward Watkins (which had already caused Judge Fitz-

patrick to disqualify himself) could not be imputed to Chief Judge Owens merely because Judge Fitzpatrick had made his own bias known.

5. The fifth motion for disqualification was filed two months later, on May 16, 1990, in the civil cases (*Cheeves and Gibson v. Southern Clays, Inc.*). It was predicated upon 28 U.S.C. §§ 144 and 455, and was supported by a number of affidavits including those of Watkins and moving counsel. The only new matter submitted, however, was the assertion that new evidence had come to light during the March 20 hearing in *Watkins* during which Chief Judge Owens "admitted" for the first time [9] that he was, in fact, the "other judge" with whom Judge Fitzpatrick had conferred before referring Watkins' subornation of perjury to the prosecutor.

On May 23, 1990, Chief Judge Owens entered an order denying the motion, saying:

> [T]he court finds that nothing cited in the affidavits submitted on behalf of the plaintiffs illustrates any personal bias or prejudice on the part of this judge against any of the plaintiffs or Mr. Watkins. The only thing that the facts recited above show is that Judge Fitzpatrick, as part of his judicial function, communicated orally and in writing to this judge, as Chief Judge of the Middle District of Georgia, his intention to refer the perjury matter involving Mr. Watkins to the grand jury and to recuse himself from presiding over any cases in which Mr. Watkins had an interest. Inasmuch as Judge Fitzpatrick's communications with this judge were conducted as part of both judges' judicial administrative function, they do not constitute information

---

**9.** Counsel for Watkins and the civil plaintiffs makes much of the fact that Chief Judge Owens' "admission" during the March 20 hearing in *Watkins,* that he was the "other judge," was the first time this fact was disclosed or made known; and he goes so far as to characterize as a "lie" Chief Judge Owens' statement during the same hearing that "it was revealed way back there" and "somewhere I know this has been discussed." To be sure, it does not appear in the record that any specific identification of Chief Judge Owens as the "other judge" had been established before the hearing of March

20, 1990; but the fact that there were only two judges in Macon—Owens and Fitzpatrick—and the manner in which Judge Fitzpatrick's conference with another judge had been argued on an earlier occasion, could, and obviously did, lead Chief Judge Owens to conclude that his personal participation in the conference had been established. In any event, there was clearly no conscious concealment of that fact which *was* freely acknowledged during the March 20 hearing, and to brand as a lie his musings that it had been disclosed before is an unseemly defamation.

received from an extrajudicial source. Thus, they are insufficient as a matter of law to warrant the recusal of this judge.

Following entry of that order, counsel for Watkins and the civil plaintiffs applied for relief in the Court of Appeals seeking issuance of writs of mandamus and prohibition, but that petition was denied without discussion by an unpublished order of the Court of Appeals entered June 25, 1990. *In re Theodore Gibson,* No. 90–8561 (11th Cir., June 25, 1990), *reh'g and suggestion of reh'g en banc denied* (Sept. 18, 1990). It was several months later, on December 7, 1990, that the Court of Appeals also decided by unpublished opinion the direct ·appeal taken from Watkins' conviction in the criminal case. *United States v. Watkins,* 921 F.2d 285 (11th Cir.1990), *reh'g denied,* 931 F.2d 901 (11th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 333, 116 L.Ed.2d 273 (1991). The disqualification issue was the central focus of the opinion, and the denial of the recusal motions by Chief Judge Owens was affirmed on the same basis he had consistently relied upon in his rulings, i.e., that the claim of bias related to judicial acts and communications,

not extra-judicial sources or personal reasons.[10]

6. On September 26, 1991, yet another motion to recuse was filed in the civil cases pursuant to 28 U.S.C. § 455 and Canon 3(C)(1) of the Code of Judicial Conduct for United States Judges. This time the motion asserted that the impartiality of both Chief Judge Owens and Judge Fitzpatrick might reasonably be questioned because moving counsel had now filed with the Judicial Council of the Circuit a judicial misconduct complaint against the judges pursuant to 28 U.S.C. § 372(c), and had also submitted similar charges to the Public Integrity Section of the Criminal Division of the Department of Justice.[11] The defendants in their response argued that a party cannot "force disqualification by attacking the judge and then claiming that these attacks must have caused the judge to be biased against him." *See* 13A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3542, at 578 (2d ed. 1984). A brief order was then entered by Chief Judge Owens denying the motion without discussion on December 13, 1991.

**10.** Because the Court of Appeals opinion was unpublished and because it is, in the criminal action, the law of the case bearing upon the issue to be decided (as opposed to mere precedent), it is appropriate to set out the pertinent part of that opinion at length:

Appellant also argues that the district judge erred in declining to recuse himself and in declining to refer the recusal decision to another judge pursuant to 28 USC § 144. After a careful review of the record, we conclude that the district judge did not abuse his discretion.

The letter dated July 11, 1989 conveyed certain information relating to the previous judge's decision to recuse himself. The district judge in this case received that information in his judicial capacity, *i.e.,* as the chief judge of the district with responsibility for reassigning the case. Thus, the district judge acquired that knowledge in his judicial capacity and not in an extra-judicial capacity. Moreover, there is nothing in the letter which indicates bias on the part of the district judge; the letter indicates bias only on the part of the previous judge on account of which he recused himself.

Appellant also asserts that the district judge in this case was biased as a result of confer-

ring with the previous judge. Taking all reasonable inferences favorable to appellant, the context of the alleged conference is as follows: The previous judge, while presiding in a civil case, conferred with his chief judge concerning the appropriate procedure when he suspected that appellant had aided and abetted perjury. The procedure which was in fact followed (and therefore may have been discussed with the chief judge in the alleged conference) was to refer the matter to the appropriate authorities for possible prosecution and to stay the civil case. Thus, any information conveyed at the alleged conference was received by the district judge, *i.e.,* the chief judge, in his judicial capacity and not in an extra-judicial capacity. Moreover, nothing in the information which could reasonably have been received by the district judge would indicate disqualifying bias on the part of the judge.

The other assertions of bias on the part of the district judge are wholly without merit and warrant no discussion.

AFFIRMED.

**11.** Both proceedings have since been terminated upon a finding that the charges were unsubstantiated.

7. Most recently, and subsequent to my designation in relation to these cases, a motion has been filed in the criminal action pursuant to 28 U.S.C. § 2255; and additional motions have been filed in both the criminal and the civil cases specifically addressed to my attention and seeking disqualification of the active judges of the Middle District of Georgia on the same grounds variously asserted in the previous motions. Except for the matters specifically decided in this opinion, however, I decline to entertain or decide those motions or any other issues beyond the scope of my designation which is limited to "any party's attempt to take the depositions of [the active judges]."

## C. DISCUSSION

On December 20, 1991, when the notices of deposition and subpoenas *duces tecum* were directed to the judges, the criminal case was closed[12] and the most recent recusal motion in the civil cases had already been denied by Chief Judge Owens' order of December 13. A threshold question therefore presents itself: What is the basic source of authority for the issuance of such notices and subpoenas irrespective of the status of the proposed deponents?

■■■■ In the criminal case, even if it was still pending in the district court, no authority exists for the issuance of a deposition subpoena except Rule 17(f)(1) of the Federal Rules of Criminal Procedure, and the rule expressly requires "an order to take a deposition" as a necessary prerequisite to invoking such process. No prior order authorizing the depositions was sought or entered in this instance, and that flaw alone requires that the Government's

motion to quash be granted. Moreover, even if the attempted discovery was being pursued in anticipation of a motion to be made under 28 U.S.C. § 2255 for collateral relief from the judgment (as has since been filed), the depositions would still be inappropriate because Rule 6(a) of the Rules Governing § 2255 Proceedings expressly provides, like Rule 17 of the criminal rules, that advance leave of court must be sought on good cause shown. Still further, in this instance, if leave of Court had been sought in aid of the now pending motion under § 2255,[13] such leave would necessarily be denied in view of the prior adjudication of the recusal issue by the Court of Appeals on the direct appeal.[14] It is the established law of the case in the criminal action that the communications between Judge Fitzpatrick and Chief Judge Owens, both orally and in writing, did not give rise to a ground for disqualification; and if the Court of Appeals had required an "enlargement of the record"[15] to decide the issue, it could have remanded the case for that purpose. It follows, at least in the criminal case, that the motion to quash the notices of deposition and subpoenas *duces tecum* must be granted.

In the civil cases, the source of authority for the taking of any depositions, and the issuance of subpoenas commanding attendance of the deponents, is the Federal Rules of Civil Procedure, especially Rules 26, 30 and 45, respectively. Rule 26(b)(1) provides:

> Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the

---

**12.** Sentence was imposed on March 23 and judgment was entered on March 27, 1990. The mandate of the Court of Appeals affirming the judgment was filed on April 17, 1991, and the judgment was executed when Watkins surrendered himself to the Federal Correctional Institution, Jesup, Georgia on May 20, 1991. The Order of the Supreme Court denying certiorari was filed October 24, 1991.

**13.** In his response to the Government's motion to quash, counsel for Watkins does ask the court to grant leave *nunc pro tunc* for the taking of the depositions.

**14.** *See supra* note 10.

**15.** The phrase "enlargement of the record" is borrowed by counsel from the decision in *Easley v. University of Michigan Board of Regents*, 853 F.2d 1351, 1358 (6th Cir.1988), *cert. denied,* —— U.S. ——, 111 S.Ct. 1414, 113 L.Ed.2d 467 (1991), and is asserted as the underlying justification for taking the depositions of the judges. *Easley* will be the subject of further discussion, *infra.*

claim or defense of the party seeking discovery or to the claim or defense of any other party.... It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

From this literal text of the rule it might well be argued that there is no right to pursue any discovery concerning a dispute that does not directly arise from the issue pleadings, i.e., any issue other than the merits of the case; and, indeed, the precise question presented (whether discovery may be sought in aid of a contemplated motion for disqualification of the presiding judge) is apparently an issue of first impression. No decision has been cited, or otherwise found, which bears directly upon this problem whether the intended deponent is the presiding judge or someone else.[16]

■ However, in *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 2389, 57 L.Ed.2d 253 (1978), the Supreme Court quoted Rule 26(b)(1) of the Federal Rules of Civil Procedure, and observed:

The key phrase in this definition—'relevant to the subject matter involved in the pending action'—has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case. *See Hickman v. Taylor,* 329 U.S. 495, 501, 67 S.Ct. 385, 388, 91 L.Ed. 451 (1947) (footnote omitted). Consistently with the notice-pleading system established by the Rules, discovery is not limited to issues raised by the pleadings, for discovery

itself is designed to help define and clarify the issues. *Id.,* at 500–501, 67 S.Ct. at 388. Nor is discovery limited to the merits of a case, for a variety of fact-oriented issues may arise during litigation that are not related to the merits (footnote omitted).

Discovery under the rules is thus available with respect to a wide variety of collateral or ancillary issues. *See, e.g., Eaton v. Dorchester Dev., Inc.,* 692 F.2d 727 (11th Cir.1982) (discovery regarding in personam jurisdiction issues); *National Serv. Indus. v. Vafla Corp.,* 694 F.2d 246 (11th Cir.1982) (post judgment discovery in aid of execution); *Gillespie v. Civiletti,* 629 F.2d 637 (9th Cir.1980) (discovery regarding identity of John Doe defendants). Despite the absence of specific precedent, therefore, I conclude that the discovery mechanisms of the Federal Rules of Civil procedure would be available in an appropriate case[17] to a party who contemplates filing a motion for disqualification of the presiding judge pursuant to 28 U.S.C. §§ 144 or 455(a), and who wishes to establish relevant facts from witnesses other than the presiding judge such as, in this instance, Judges Fitzpatrick and Elliott. Before deciding whether they may be deposed, however, it is appropriate to proceed to the principal question presented, namely, whether compulsory discovery may ever be sought directly from the presiding judicial officer as well.

1. Compulsory Discovery from a Presiding Judicial Officer.

At the outset, there is simply no precedent for deposing the presiding judge pursuant to compulsory process in aid of motions to disqualify;[18] and, for a number of

**16.** Such discovery was sought in *United States v. Yonkers Bd. of Educ.,* 946 F.2d 180 (2d Cir. 1991), but the court did not decide whether the discovery was legally appropriate under Rule 26 because it determined that sufficient information regarding the events underlying the motion to recuse had already been supplied and that further discovery would serve no useful purpose.

**17.** By using the term "appropriate case" I mean a case in which the party seeking discovery is able to demonstrate in good faith, pursuant to Rule 26, a substantial basis for believing that

the discovery being sought "appears reasonably calculated to lead to the discovery of admissible evidence" in support of a pending or contemplated motion for disqualification, and that such information is not "obtainable from some other source that is more convenient."

**18.** There is one case, *Health Servs. Acquisition Corp. v. Liljeberg,* 747 F.2d 1463 (5th Cir.1984) (unpublished opinion), *appeal after remand,* 796 F.2d 796 (5th Cir.1986), *aff'd,* 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988), in which the Court of Appeals initially remanded the case for a hearing before a different district judge to

practical as well as legal and policy considerations, there is no need or justification for such a procedure.

### (a) Lack of necessity; judicial vs. extra-judicial bias.

First, there is the matter of distinguishing between judicial bias and extra-judicial or personal bias. It is well established as the law of this and other circuits that an allegation of bias sufficient to require disqualification under either Section 144 or Section 455(a) must demonstrate that the alleged bias is personal as opposed to judicial in nature. *E.g., Jaffree v. Wallace,* 837 F.2d 1461, 1465, (11th Cir.1988); *United States v. Meester,* 762 F.2d 867, 884 (11th Cir.1985), *cert. denied,* 474 U.S. 1024, 106 S.Ct. 579, 88 L.Ed.2d 562; *United States v. Story,* 716 F.2d 1088, 1091 (6th Cir.1983). If a circumstance giving rise to a perceived or even a declared prejudice by a judge arises out of communications or events known to the judge only by virtue of prior judicial proceedings or actions taken by him or her in a judicial capacity (such as administrative oversight by a chief judge, as in this case), there is no basis as a matter of law for disqualifying the judge. This is more a rule of necessity than a result of statutory interpretation.[19] If the law was otherwise there would be no end to the circumstances in which judges could effectively be disqualified in the middle of a case with chaotic results in terms of judicial efficiency. Thus, if an attempt to depose the presiding judge relates to transactions, communications or events that would fall within a category of judicial rather than extra-judicial matters, the deposition should be precluded for the simple reason that it is not calculated, within the meaning of Rule 26, to lead to the discovery of admissible evidence.

In this instance, counsel for Watkins and the civil plaintiffs persists in referring to the pertinent oral and written exchanges between Judge Fitzpatrick and Chief Judge Owens as improper *ex parte* communications which were, he concludes, extra-judicial communications as well. One problem with this assertion is that the term *"ex parte* communication" is an ethical concept the definition of which expressly excludes consultation with other judges. *See* Commentary to Canon 3A(4), *Code of Conduct For United States Judges,* 2 Administrative Office of The United States Courts, *Guide to Judiciary Policies and Procedures* (1990). In addition, as previously noted, the Court of Appeals has already established as the law of the criminal case at least, that the communications here were judicial, not extra-judicial, for purposes of Sections 144 and 455(a). It follows that further discovery of the content of those communications would serve no useful purpose.

### (b) The governing statutes exclude a need for such discovery.

There are also reasons to be found in the pertinent statutes themselves for precluding discovery from the presiding judge. Under Section 144, the judge must look only to the content of the supporting affidavit; whether it is true or false is irrelevant. Indeed, even if blatantly false, the affidavit must be accepted as true for purposes of determining its legal sufficiency. *United States v. State of Alabama,* 828 F.2d 1532, 1540 (11th Cir.1987), *cert. denied sub nom., Board of Trustees of Alabama State Univ. v. Auburn Univ.,* 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988). That circumstance, coupled with the requirement that the party-affiant

resolve fact issues relating to a motion to disqualify that had previously been denied by the presiding judge, and during the proceedings on remand it appears that the presiding judge voluntarily submitted to the taking of his deposition. References to the deposition are made in the unpublished opinion of the district judge who conducted the proceedings subsequent to the remand, but there is no explanation as to how the deposition came about. *Health Servs. Acquisition Corp. v. John A. Liljeberg, Jr.,* Civil

Action No. 81–4714, Section A (E.D.La., Dec. 27, 1985) found in LEXIS as Appendix B to Petition in the Supreme Court of the United States for a Writ of Certiorari to the United States Court of Appeals for the Fifth Circuit filed December 8, 1986.

**19.** While Section 144 refers to "a personal bias or prejudice," Section 455(a) does not.

must set forth facts showing a personal bias, would seem to effectively eliminate any legitimate need for a deposition from the judge. Either the alleged bias has already been manifested in some way within the knowledge, information or belief of the party-affiant, or the effort to depose the judge would be a classic fishing expedition.

 The same result is reached under Section 455(a) and (e); and that statute supplies an additional reason why discovery from the judge is inappropriate. Subsection (e) provides:

Where the ground for disqualification arises only under subsection (a) [when the judge's impartiality might reasonably be questioned], waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification.

Thus, while the most recent amendment of Section 455 in 1974 (Pub.L. 93–512, § 1, 88 Stat. 1609, Dec. 5, 1974) was clearly intended to overrule the pre-existing "duty to sit" doctrine of *Edwards v. United States*, 334 F.2d 360 (5th Cir.1964), *cert. denied*, 379 U.S. 1000, 85 S.Ct. 721, 13 L.Ed.2d 702 (1965), to the effect that close questions concerning disqualification should be resolved against recusal, see *Davis v. Bd. of School Comm'rs of Mobile County*, 517 F.2d 1044, 1052 (5th Cir.1975), *cert. denied* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976), it is equally clear that "the new [objective] test should not be used by judges to avoid sitting on difficult or controversial cases." H.R.Rep. No. 1453, 93d Cong.2d Sess., 1974 U.S.Code Cong. & Admin.News, 6351. So, whenever it appears that disqualification may be required pursuant to § 455(a), the judge must either withdraw from the case or make "a full disclosure on the record" so that the parties may consider a waiver. *See Barksdale v. Emerick*, 853 F.2d 1359 (6th Cir.1988). The pertinent point of this in the present context is that the statute contemplates a voluntary disclosure *by* the judge rather than compulsory discovery *from* the judge.[20]

(c) *Other legal and policy reasons to preclude discovery from the presiding judge.*

 In addition to those considerations, there are other legal and policy impediments to compulsory discovery from the presiding judge. The legal obstacle is Rule 605 of the Federal Rules of Evidence:

The judge presiding at the trial may not testify in that trial as a witness. No objection need be made in order to preserve the point.

The word "trial" in Rule 605 would seem to be broad enough to encompass any evidentiary hearing conducted within the framework of a case, and should be invoked "where the individual presenting the evidence is also delegated judicial power to admit and weigh that evidence." 27 Charles A. Wright & Victor J. Gold, *Federal Practice and Procedure*, § 6063, at 344 (1990). It follows that the judge is rendered incompetent as a *witness* concerning his or her own disqualification so long as the same judge is called upon, at least initially, to decide the question; and, while it might be argued that the judge could still be subject to discovery inquiries which *might* lead to *other* admissible evidence, such a purpose would begin to resemble a fishing expedition. If other witnesses or documents are known, then the testimony of the judge is unnecessary. If they are unknown, then no sufficient basis exists to proceed with the discovery. Other rhetorical questions raised by the Advisory Committee Notes to Rule 605 would also demand responses if such discovery were permitted. Who rules on objections? Who compels an answer?

Finally, sound policy considerations speak out loudly against compulsory discovery from the presiding judge. Embroiling the presiding judge in the adversarial processes of any case is not only unseemly,

**20.** One of counsel's complaints in this case is that Chief Judge Owens did not make "a full disclosure on the record." As previously noted, Chief Judge Owens thought he *had* disclosed his conference with Judge Fitzpatrick. In any event, if more disclosure is required, it would be within the province of the Court of Appeals to require it if that Court deems it necessary in order to produce a reviewable record. See discussion *infra*.

it is calculated to give rise at the least to a resulting appearance of bias against the aggressor litigant although, as previously noted, that species of boot strap bias cannot be recognized, as a matter of law, as a disqualifying circumstance. To do so would simply invite manipulated harassment by any lawyer unscrupulous enough to willingly embark on a course of conduct designed to disqualify an otherwise impartial judge whose views are thought to be adverse to the interests of the client. Such a tactic would, at worst, cause an unjustified voluntary disqualification of the presiding judge or, at least, cause endless delay in the litigation while those maneuvers are in process.

(d) *Conclusion.*

■ I conclude and now hold, therefore, that compulsory discovery process addressed to the presiding judge in aid of a motion to disqualify that judge pursuant to 28 U.S.C. §§ 144 and 455(a) is not available to a litigant upon initial presentation of the motion or the request for such discovery in the district court. Discovery of other persons may be pursued in appropriate cases (*see supra* note 17), and it behooves the presiding judge to "make a full disclosure on the record" pursuant to Section 455(e) in order that a waiver may be considered or, if the motion is denied without a waiver, to make some such disclosure, either by a separate statement or in the ruling on the motion itself, so that the Court of Appeals will have a reviewable record. But, absent subsequent order of the Court of Appeals directing enlargement of the record, discovery of the presiding trial judge may not be had.

(e) *An Exception.*

■ While compulsory discovery of the trial judge may not be pursued upon initial presentation of a motion to disqualify in the trial court, this does not mean, if the motion is denied, that the aggrieved

litigant is without a remedy and can never secure relevant and necessary facts from the judge. When a motion to recuse is denied, with or without a voluntary factual disclosure on the record by the presiding judge, the aggrieved litigant has an immediate remedy in the form of a petition for a writ of mandamus in the Court of Appeals. *See United States v. State of Alabama, supra,* 828 F.2d at 1538–1539.[21] And, once the case is in the Court of Appeals, that court can and will remand for further factual development of the record, often by a different judge, if record development is found to be necessary to the making of the ultimate decision on review of the district court. There are numerous examples, *United States v. State of Alabama, supra,* being one such case; and, interestingly, except for *Health Servs. Acquisition Corp. v. Liljeberg, supra* note 18, none of these examples present a case in which the presiding judge was deposed even during proceedings before a different judge on remand.

In *Potashnick v. Port City Construction Co.,* 609 F.2d 1101 (5th Cir.1980), *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980), for instance, a disqualification issue was decided on remand from the Court of Appeals by a different district judge "on affidavits, exhibits and argument." *Id.* at 1106. In *Price Bros. Co. v. Philadelphia Gear Corp.,* 629 F.2d 444 (6th Cir.1980), *following remand,* 649 F.2d 416 (6th Cir.1981), *cert. denied,* 454 U.S. 1099, 102 S.Ct. 674, 70 L.Ed.2d 641 (1981), a hearing was conducted by a different district judge who took testimony from witnesses and "the [original or presiding] trial judge submitted a statement concerning the matters that necessitated the remand." 649 F.2d at 420. In *Easley v. Univ. of Michigan Bd. of Regents,* 853 F.2d 1351 (6th Cir.1988), *following remand,* 906 F.2d 1143 (6th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 1414, 113 L.Ed.2d 467 (1991), the Court of Appeals remanded for

---

21. In the Seventh Circuit, immediate application for mandamus is the only means of review. Waiting to present the issue on final appeal constitutes a waiver of the claim. *United States v. Troxell,* 887 F.2d 830, 833 (7th Cir.1989). In the Eleventh Circuit, review is apparently available on final appeal as well. *See Potashnick v. Port City Constr. Co.,* 609 F.2d 1101 (5th Cir. 1980), *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980).

"enlargement of the record." 853 F.2d at 1358. A different judge then permitted discovery between the parties, limited to an exchange of interrogatories, and the presiding judge in the case "submitted an affidavit" concerning the disqualification issues. 906 F.2d at 1145.

 In this case, as previously noted, an application for mandamus was filed in the Court of Appeals after denial of the fifth motion for disqualification in the civil cases, and that application was denied by the Court of Appeals without discussion by unpublished order entered June 25, 1990. *In re Theodore Gibson,* No. 90–8561 (11th Cir., June 25, 1990), *reh'g and suggestion of reh'g en banc denied* (Sept. 18, 1990). To be sure, given the lack of explanation in the order concerning the reasons for denial of relief, it cannot be said that the entry of the order precludes further consideration under the doctrines of *res judicata* or law of the case. *United States v. Dean,* 752 F.2d 535, 541–542 (11th Cir.1985), *cert. denied,* 479 U.S. 824, 107 S.Ct. 97, 93 L.Ed.2d 48 (1986). It can be said, however, that the Court of Appeals saw no reason at that time to intervene for the purpose of "enlarging the record"; and, precisely because the mandamus proceeding had no preclusive effect, the Court of Appeals will yet have another opportunity on final appeal, if it chooses, to revisit the disqualification issue and may remand the case at that time if it finds a need for additional factual development which it can define and direct accordingly.

2. Discovery from Judges Fitzpatrick and Elliott.

 I earlier decided that in an "appropriate case" the discovery mechanisms of the Federal Rules of Civil Procedure would be available to depose witnesses other than the presiding judge, and I then proceeded to decide whether the presiding judge could be deposed also. Left aside was the question as to whether this is an appropriate case for the taking of the depositions of Judges Fitzpatrick or Elliott or either of them.

While there is no rigid impediment to the taking of their depositions as there is in the case of Chief Judge Owens as the presiding judge, I have nonetheless determined that neither should be subject to compulsory discovery process in the circumstances of this case. On the basis of the showing made in support of the asserted need for such discovery, the only line of relevant inquiry to be addressed to either would relate to judicial communications between or among the three judges, and that information is simply not relevant, i.e., it does not relate to extra judicial bias. The record is sufficiently complete to permit a ruling on the disqualification claims, and if the Court of Appeals ultimately comes to a contrary view, it can remand and give further direction to the additional discovery needed to decide the issue.

My designation was not to decide the disqualification issues. Rather, my limited charge was to decide whether the depositions of the judges could be taken during the litigation of those issues within the framework of these cases; and, having decided that such depositions may not be taken except on remand or other direction from the Court of Appeals which has not been given, that is the end of the present inquiry.

The motions to quash are GRANTED and the noticed depositions of Chief Judge Owens and Judges Elliott and Fitzpatrick shall not be taken.

IT IS SO ORDERED.

DONE and ORDERED.